IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RETA L. ROBERTS,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of the Social Security<br>Administration;<br><br>                    Defendant. | **4:12CV3180**<br><br>**MEMORANDUM AND ORDER ON<br>REVIEW OF THE FINAL DECISION<br>OF THE COMMISSIONER OF SOCIAL<br>SECURITY** |

Reta L. Roberts filed a complaint on August 27, 2012, against Michael J. Astrue, Commissioner of the Social Security Administration.[1] (ECF No. 1.) Roberts seeks a review of the Commissioner's decision to deny her application for (1) disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and (2) Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C §§ 1381 et seq. The defendant has responded to the plaintiff's complaint by filing an answer (ECF No. 9) and a transcript of the administrative record. (ECF Nos. 10-12.) In addition, pursuant to the order of Magistrate Judge Thomas D. Thalken on December 10, 2012, (ECF No. 15), each of the parties has submitted a brief in support of his or her position. (See Pl.'s Br., ECF No. 22; Def.'s Br., ECF No. 27.) After carefully reviewing these materials, I find that the Commissioner's decision must be affirmed.

---

[1] On March 14, 2013, the defendant filed a notice that Michael J. Astrue had been terminated as Commissioner of the Social Security Administration and that Carolyn W. Colvin had been appointed to serve as Acting Commissioner of the Social Security Administration. (ECF No. 19.) Colvin has therefore been substituted as a party in this case pursuant to Federal Rule of Civil Procedure 25(d).

# I.   BACKGROUND

On May 2, 2008, Roberts protectively filed applications for disability insurance benefits under Title II and SSI benefits under Title XVI of the Act. (See ECF No. 10, Transcript of Social Security Proceedings (hereinafter "Tr.") at 8.) After her applications were denied initially and on reconsideration, (id. at 132, 136) the plaintiff requested a hearing before an administrative law judge (hereinafter "ALJ").  (Id. at 139).  This hearing was conducted on April 14, 2010. (Id. at 39-125).  In a decision dated December 8, 2010, the ALJ concluded that Roberts was not entitled to disability insurance benefits or SSI benefits. (Id. at 8-26). The Appeals Council of the Social Security Administration denied Roberts' request for review.  (Id. at 1-5).  Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Roberts seeks judicial review.

# II.   SUMMARY OF THE RECORD
## A. Medical Evidence

In August 2002, Roberts had a work-related injury to her right upper extremity. (Id. at 289). For workers' compensation purposes, she claimed temporary total disability for four weeks. Rajesh Kumar, M.D., determined that she had a five percent impairment to the right upper extremity. Kumar stated that Roberts would not require future treatment or surgery and would be able to do light-duty work, such as a cashier. She had restrictions of lifting, pulling, or pushing no more than 15 pounds. (Id. at 295). A second physician found no impairment and no disability. (Id. at 289-90, 296).

Roberts returned to Kumar on January 7, 2004, for shoulder pain. (Id. at 1053). Kumar stated that Roberts had developed chronic pain syndrome and had moderate pain most of the time which restricted her day-to-day activities. She had

2

reached maximum medical improvement. Kumar reaffirmed that she had a five percent permanent partial disability of the right arm which was directly related to her work-related accident of 2002 and that she could do light-duty work, like a cashier, with a 15-pound restriction of lifting, pulling, or pushing. (Id. at 1054).

Roberts alleged that the onset date of her disability was September 10, 2004. (Id. at 224). She claimed she stopped working on May 31, 2007, due to her medical condition.  In a disability report, Roberts said she has arthritis that causes pain in her back, hip, and hands, she cannot grasp objects, and she can barely hold a pen. Roberts made no mention of any mental impairments. (Id.)

Roberts was in an auto accident in October 2004. She went to the emergency room complaining of headache, left side neck pain, and left chest wall pain. (Id. at 668-69), but X-rays and a CT scan were negative. She was diagnosed with a concussion and was prescribed Motrin as needed for pain. (Id. at 676). One week later, she returned complaining that she was dizzy and losing her memory. (Id. at 663). She was diagnosed as having a scalp contusion and post-concussion syndrome. (Id. at 666). She was in another automobile accident in February 2006. (Id. at 573, 575). She complained of rib pain, but no fracture was found. (Id. at 577). She was discharged with hydrocodone. (Id. at 587).

In September 2006, a screen door fell on Roberts' foot, but X-rays showed no fracture, malalignment, or other abnormality. (Id. at 709, 711, 723). She was diagnosed with a left foot ulceration with cellulitis, chronic left arm numbness, altered mental status with drowsiness related to methamphetamine withdrawal, asthma, anxiety, and oral ulcers. (Id. at 713). She was treated with antibiotics and pain medication and discharged after one night in the hospital. (Id.).

On May 30, 2008, Roberts went to the emergency room, complaining of back and right hip pain. (Id. at 777-78). X-rays showed mild degenerative change,

but no lesions or fractures. (Id. at 781). She was diagnosed with mild scoliosis. (Id. at 782). Roberts saw a physician on June 2, 2008, for chronic back pain. (Id. at 836). X-rays of her spine and hip were normal except for scoliosis. (Id.).

Roberts underwent physical therapy beginning on July 29, 2008. (Id. at 821). She had pain that limited her range of motion in her lumbar spine and decreased lumbar stability that limited her ability to perform activities of daily living. (Id.). She missed several appointments because she said she was busy. (Id. at 881). On October 15, 2008, she was to have two more visits and be reassessed for discharge at that time. (Id. at 882).

On June 21, 2009, an MRI showed moderate compression deformity of the T11 vertebral body level, which was unchanged from the February 2009 MRI examination. (Id. at 1085). In October 2010, Roberts had a microdiscectomy for a large, extruded, herniated disc, left L4-L5. (Id. at 1186).

After the hearing, Roberts' counsel wrote to the ALJ on October 12, 2010, to report that Roberts had recently had another back surgery. She had complained of leg pain to a provider who accused her of drug-seeking and sent her home. She went to the emergency room and was given medication and discharged. She returned to the emergency room because of continuing pain and was found to be in need of surgery because she could no longer feel her left leg. Post-surgery she was using a walker and a cane. She had fallen once since the surgery because she could not feel her left foot and she has foot-drop with that foot. (Id. at 325).

On January 25, 2011, Roberts visited Nebraska Pain Consultants for her lower back pain. (Id. at 1280). It was recommended she take part in water therapy and use non-opioid medications. (Id. at 1285). On April 11, 2011, she returned and declined an epidural steroid injection in her back. (Id. at 1288). The records indicate that her pain was consistent with post-laminectomy syndrome. (Id.).

4

From May 12, 2011, through June 28, 2011, Roberts underwent 12 physical therapy treatment sessions. (Id. at 1273). She was discontinued after she failed to call to reschedule any further appointments. (Id.).

## B. Mental Health Evidence

Although Roberts did not mention mental health issues as causing her disability (Id. at 224), she offered evidence of her treatment for mental health issues and methamphetamine abuse. The record shows that she was taken to the emergency room by police on January 5, 2004, for a mental health evaluation. (Id. at 644, 648). Her boyfriend apparently reported that Roberts had made a suicide pact with her sister, but Roberts denied any suicidal or homicidal ideation. (Id. at 649-650). She told the nurse that her boyfriend had been abusive to her and that he is addicted to OxyContin. (Id. at 649).

Roberts went to Lutheran Family Services for a comprehensive psychosocial assessment on July 10, 2007. (Id. at 949). The record does not reflect whether she began any treatment program at that time, but she had a second intake appointment on May 29, 2008, and began treatment on June 3, 2008. (Id.). When she graduated on May 6, 2009, she was at minimal to no risk for self harm or harm to others. (Id. at 966). On admission her GAF was 42, and on discharge it was 53.[2] (Id. at 967). It was recommended that Roberts continue to actively engage in AA meetings, make daily contact with her sponsor, use her support system, find and maintain employment, meet probation requirements, and take part in 12 to 16 weeks of aftercare. (Id. at 968, 970).

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)).

On July 18, 2007, Roberts went to the emergency room complaining of dizziness. (Id. at 511-12). She reported that she had been either smoking or snorting methamphetamine almost daily for the last year. (Id. at 518). After using methamphetamine the previous day, she had been vomiting for 24 hours and said she was dizzy and unable to stand. However, the emergency room report showed that she was able to ambulate to the phone and stand for 10 minutes without any obvious difficulties. (Id. at 515). The physician stated that the dizziness was probably a result of drug abuse, but Roberts was given medication. (Id. at 519). The physician stated that Roberts needed inpatient treatment, but she was not receptive to that process. Roberts asked to go to the Independence Center, but there is no formal detoxification program for methamphetamine. She refused to go to Cornhusker Detox for initial evaluation and treatment. (Id. at 519-20). She was discharged in stable condition with clinical resources to help establish a treatment program. (Id. at 520). Roberts was placed on the waiting list for Touchstone, a short-term residential substance abuse treatment program. (Id. at 520, 698).

Roberts was evaluated at Touchstone on July 26, 2007. (Id. at 698). She reported that she voluntarily sought treatment after she relapsed on methamphetamine. (Id.). She reported that she had been hospitalized for four days about two weeks earlier and was then diagnosed with bipolar disorder. (Id.). She had been homeless for about two months after she lost her apartment when she went to jail for attempted distribution of methamphetamine, paraphernalia, and possession. (Id. at 699). About one month earlier, Roberts had gone to St. Monica's for treatment, but she tested positive for methamphetamine upon admission and was sent to a detoxification center. She left the detoxification center after four days. (Id.).

6

Roberts reported that she had worked as a certified nursing assistant, in a factory, in fast food, and at a convenience store, where she would often use methamphetamine before and after work. (Id. at 700). Roberts said she was first charged in 1997 with conspiracy to distribute methamphetamine for which she was given five years' probation and 200 hours of community service. (Id.). In 2006, she was charged with attempt to distribute methamphetamine and possession of 11 grams of methamphetamine and paraphernalia. That charge was pending at the time of the Touchstone evaluation. (Id.).

Roberts reported that she tried methamphetamine when she was 13 and used it until she was 19. She quit for two years while she was pregnant, and then used for approximately six months. She went to treatment at the Independence Center and then did not use any alcohol or drugs between the ages of 21 and 33. She relapsed at age 33 and began using five to six grams a day intravenously for nine months. She had last used methamphetamine the day before she entered Touchstone. (Id. at 701). The evaluation showed Roberts' GAF was 32. (Id. at 702). She had difficulty remembering events in her life, including her use of drugs and alcohol, and it was not clear if she had cognitive issues or if she was being dishonest. (Id.).

The psychiatric assessment at Touchstone resulted in a diagnostic impression of depression, NOS, methamphetamine, alcohol, and cannabis dependence. (Id. at 705). Kelli Bremer, M.D., stated that she could not conclude that Roberts had bipolar affective disorder type II because the history given by Roberts was poor. (Id.). Her GAF was 40. Bremer said Roberts was in a "rather odd state" and it was planned to have her undergo a drug screen to determine whether she was under the influence of some other drugs because her demeanor suggested that possibility. (Id. at 706).

7

Roberts entered treatment at Touchstone and was discharged on August 7, 2007, for repeated rule violations. (Id. at 707). The discharge summary stated that, during Roberts' first week, she violated facility rules, was aggressive, and appeared to be under the influence. She had slurred speech, incoherent thoughts, was irritable, and nodded off in groups. Roberts denied violating facility rules and failing to complete assigned chores when she was confronted in group therapy. She attempted to blame the group, saying that they did not understand her. Because her treatment was focused on rule violations, she did not address her addiction prior to discharge. Her prognosis was poor and it was recommended that she continue to seek treatment. (Id.). She was diagnosed with methamphetamine dependence and cocaine abuse, and personality disorder traits.  Her GAF at the time of discharge was 32. (Id. at 708).

On March 31, 2008, Roberts was again assessed at Touchstone. (Id. at 920). Roberts was referred by her probation officer, but she said she did not know the reason she was there. (Id.). She reported that she had been charged with two counts of attempted distribution of methamphetamine and one count of possession and paraphernalia. (Id.). She was sentenced to 180 days on each charge and had been released from jail and placed on probation for 18 months. (Id. at 922). She said she had not used drugs since she had been incarcerated, but she said she was craving drugs. She wanted treatment to be successful, but it needed to be on her own terms. (Id.). Her GAF at the time was 35. (Id. at 923). Roberts appeared to be more motivated for the program and more able to focus. (Id. at 923-24). On June 2, 2008, Roberts was discharged from Touchstone after meeting the program's requirements. She was able to identify the severity of her addiction and was compliant with rules. (Id. at 928). Roberts' prognosis was fair, and it was recommended that she attend an intensive outpatient program with Lutheran

Family Services and a minimum of four 12-step meetings each week. If she chose not to find employment, it was recommended that she volunteer 20 hours per week. (Id.).

On June 12, 2008, Roberts was evaluated at Centerpointe. (Id. at 785). She reported that she was in after care with Lutheran Family Services, but the evaluator noted that Roberts' memory was poor and she was a poor historian. Roberts reported that she had been diagnosed with depressive and bipolar disorders, but it was not confirmed by the interviewer. Roberts reported manic behavior which lasts for two to three days and her depressive feelings can sometimes last up to a couple of weeks. The interviewer noted that because Roberts was not a good historian, it was difficult to ascertain her symptoms or their duration. (Id. at 787).

Roberts reported that she last used methamphetamine in October 2006, and for about six months, she used an eight ball or more a day. (Id.). She reported that she was at St. Monica's on two separate occasions in 2006 and did not complete the programs. She went to Campus of Hope in 2007 and again failed to complete the program. She went to Touchstone in 2007 and did not finish, but she went back in 2008 and completed the program. (Id. at 788). Based on the history provided by Roberts, she was diagnosed with amphetamine dependence with physiological dependence, sustained full remission; post traumatic stress disorder; alcohol dependence with physiological dependence, sustained full remission, depressive disorder NOS, and rule out bipolar II disorder. (Id.). Her GAF was 40. (Id. at 789). It was recommended that Roberts obtain employment or retraining and continuing case management and medication management services. (Id.).

On July 15, 2008, a psychiatric assessment at CenterPointe stated that Roberts had been discharged from the intensive outpatient program at Lutheran Family Services and that she wanted to attend classes at CenterPointe. (Id. at 790).

She claimed she had been drug-free for 500 days and attended AA meetings two to three times each week. The diagnostic impression was "Methamphetamine Dependence in Remission, History of Polysubstance Abuse, Bipolar Disorder with Psychotic Features, Alcohol Dependence in Remote Remission, and Victim of Rape twice." Her current GAF was 35-40. (Id. at 794).

Psychiatric progress notes from the outpatient treatment program at CenterPointe on September 26, 2008, showed that Roberts reported increased difficulty initiating sleep, and racing and disorganized thoughts. (Id. at 886). Roberts also reported that she had relapsed twice on methamphetamine in the previous week. (Id.).

On October 7, 2008, Roberts went to the emergency room complaining of an increase in depression, poor sleep, and suicidal thoughts. (Id. at 863). She was seen by the Independence Center and by the time she was discharged from the hospital on October 10, 2008, she was more coherent and denied suicidal thoughts. She was scheduled to go to St. Monica's on October 21, 2008, for short-term residential treatment. Upon discharge, her GAF was 45. (Id.).  She reported that she was denied disability for the first time two weeks earlier and because of her disappointment and financial strain, she relapsed with methamphetamine use. (Id. at 864).

Roberts was seen for follow-up at CenterPointe on November 12, 2008. (Id. at 893). She reported that her medications were not working and she was experiencing hallucination, paranoia, mood swings, and insomnia. (Id.). Her medications were adjusted and it was noted that her mood was cycling and should be monitored more closely. (Id. at 895).

In a six-month review at CenterPointe, dated November 28, 2008, it was noted that Roberts had experienced a fairly significant period of success following

10

treatment at Touchstone, but she was unable to identify specifics of the start of her relapse cycle. (Id. at 896). Her relapses began around the same time her intensive outpatient program at Lutheran Family Services ended. It was recommended that Roberts complete treatment at St. Monica's and follow the aftercare plan, access ongoing individual outpatient counseling, and remain in community support. She was on the waiting list for counseling at CenterPointe. (Id.).

Roberts was in the short-term residential program at St. Monica's between October 22, 2008, and December 10, 2008. (Id. at 900). Her GAF was 60. (Id.). She remained clean and sober throughout treatment and was at moderate risk for relapse. Her prognosis was guarded. It was recommended that she complete outpatient treatment and follow their recommendations for aftercare, continue to work with vocational rehabilitation to get a job, continue to see a psychiatrist for psychotropic medications, continue to work with her case manager at CenterPointe, and work with her sponsor and attend at least two 12-step meetings each week. (Id. at 901).

In March 2009, Roberts was receiving community support and medication management services at CenterPointe. She was participating in job training through vocational rehabilitation, and aftercare with Lutheran Family Services. She was on probation. (Id. at 1159). Roberts had been sober since completing St. Monica's in December 2008. (Id.). She returned to CenterPointe on June 15, 2009, (Id. at 1218) where it was noted that she was in "physical pain due to arthritis and her back." (Id. at 1221). She appeared to continue to need relapse prevention programming, individual counseling, case management services, and medication management services. (Id. at 1221-22).

In records submitted by Roberts, Tina Vest, APRN at CenterPointe, stated on July 9, 2009, that she had treated Roberts for bipolar disorder with psychotic

features, methamphetamine dependence in remission, and alcohol dependence in full sustained remission. (Id. at 972). Vest stated that Roberts was unable to work in any gainful employment that would adequately support her. She has difficulty with motivation and getting organized, occasional psychotic symptoms, and paranoia. Vest said Roberts' drug addiction was not a contributing factor material to her medical condition. (Id.). Vest stated that Roberts' depression continued to be significant and that it interfered with her ability to follow through on daily tasks and to pursue living more independently. She has minimal social contacts or leisure interests. (Id.). Vest stated that if Roberts maintained complete abstinence from drug and alcohol abuse, her mental health would not improve to a degree allowing her to work full-time in competitive employment. (Id. at 973). Vest said Roberts' substance abuse exacerbated the bipolar disorder, which was significant and impairing. (Id.). Vest said Roberts has a severe persistent mental illness that directly impacts her ability to obtain and maintain any gainful competitive employment. (Id. at 975).

Vest completed a form indicating that Roberts has an affective disorder, specifically bipolar disorder with depression and manic symptoms. (Id. at 976). Vest said Roberts also exhibited depressive syndrome, reflected by pervasive loss of interest in activities, appetite disturbance, sleep disturbance, decreased energy, difficulty in concentrating, thoughts of suicide, and hallucinations, delusions or paranoid thinking. (Id. at 975-76). Vest said Roberts had moderate restrictions in her daily living activities and difficulties in maintaining social functioning. She has marked deficiencies of concentration and persistence of pace resulting in a failure to complete tasks in a timely manner. (Id. at 978). Vest said there have been two episodes of decompensation that last several months. (Id. at 979). Vest said Roberts needs the structure of case management and ongoing medication

12

management. (Id. at 980). Vest said Roberts has an anxiety-related disorder and experiences fear of strangers, is hypersensitive to loud noises, and has nightmares about being attacked. (Id. at 981).

On January 4, 2010, a progress summary from CenterPointe indicated that Roberts needed continued outpatient treatment to accept and process her mental health diagnosis. She needed to learn to identify triggers for her substance use and develop effective coping skills to decrease her drug use and her mental health issues. (Id. at 1010).

When Roberts went to the emergency room on April 5, 2010, she complained that her body was shaking. The physician stated that she could be having a dystonic reaction to medication, but she also appeared to be under the influence of a combination of all her medications, or a side result of methamphetamine use. The physician stated, "Certainly the behavior appears to be somewhat psychogenic and behavioral in that she flails her legs up in the air and starts kicking them in a very coordinated fashion." (Id. at 1151).

Roberts was discharged from CenterPointe on June 24, 2010. (Id. at 1160). She had met her treatment goals to maintain her sobriety and was more consistent with counseling appointments. Roberts showed increased motivation and was more independent without having increased anxiety or panic attacks. (Id.). Her GAF was 35-40. (Id.). It was recommended that Roberts continue to build her support network and stay away from negative people and places. It was also suggested that she attend relapse prevention groups and AA/NA support groups. (Id. at 1161).

### C. Medical Opinion Evidence

On September 22, 2008, Jerry Reed, M.D., completed a physical residual functional capacity (RFC) assessment. (Id. at 837-844). The primary diagnosis was mild scoliosis and chronic back and hip pain. (Id. at 837). The secondary diagnosis

13

was asthma and a history of migraines. Other alleged impairments were being overweight and history of methamphetamine abuse. (Id.). Reed said that Roberts could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She could stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. (Id. at 838). Reed said she could occasionally climb, stoop, crouch and crawl, and frequently balance and kneel. (Id. at 839). She had no manipulative, visual, or communicative limitations. (Id. at 840-41). She was unlimited in her exposure to extreme cold, wetness, noise and vibration. She should avoid concentrated exposure to extreme heat, humidity, fumes and odors, and hazards such as machinery and heights. (Id. at 841). Reed stated that Roberts appeared to exaggerate her pain symptoms and limitations likely due to secondary gain as she has been previously denied disability and had very little positive objective medical findings to support her allegations. Reed said Roberts was less than fully credible. (Id. at 842).

On December 23, 2008, Glen Knosp, M.D., affirmed Reed's RFC. (Id. at 904). Knosp noted that recent physical therapy records showed that Roberts' foot had been feeling better to the point that she could not remember which foot was bothering her. She had mowed her lawn in October 2008. She participated in lumbar stabilizing exercises and ankle strengthening and was described as doing better. (Id.). The new medical evidence request supported the limitations outlined in the initial RFC. (Id.).

A mental RFC assessment, completed by Linda Schmechel, Ph.D., on August 6, 2008, showed that Roberts had an affective disorder, namely bipolar syndrome; an anxiety-related disorder, namely recurrent and intrusive recollections of a traumatic experience; and a substance addiction disorder. (Id. at 800, 803, 805). If Roberts was not using drugs or alcohol, she had no restrictions on daily

14

living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. If she was using drugs or alcohol, she had moderate restrictions in daily living activities, moderate difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. (Id. at 810).

Schmechel said it appeared that Roberts was again using methamphetamine since she could not be admitted to CenterPointe, which denies admission to anyone who tests positive for drugs. (Id. at 813), Schmechel stated that a duration denial, until Roberts quit using, or a denial should be considered. (Id.). Schmechel stated that Roberts did not appear to meet, equal or functionally equal any mental listings. According to Schmechel, the drug and alcohol abuse appeared to have played a major role in Roberts' mental health status. Schmechel said Roberts appeared capable of simple, unskilled employment at a significant gainful activity level, but allegations of physical limitations needed to be reviewed by a physician. (Id.).

In a mental RFC assessment completed on June 26, 2009, Vest stated that Roberts had moderate limitations in the ability to remember locations and work-like procedures and the ability to understand and remember very short and simple instructions. (Id. at 985). She had marked limitations in the ability to understand and remember detailed instructions. Vest said Roberts had moderate limitations in the ability to carry out very short and simple instructions, the ability to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, and the ability to make simple work-related decisions. (Id. at 985-86). Vest said Roberts had marked limitations in the ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to

complete a normal work day and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.). Vest stated that Roberts had moderate limitations in the ability to interact appropriately with the general public, to ask simple questions or request assistance, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. She had marked limitations in the ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id. at 986). Vest said Roberts had moderate limitations in the ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. She had marked limitations in the ability to travel in familiar places or use public transportation. (Id. at 986).

## D. Hearing Testimony

At a hearing on April 14, 2010, (Id. at 39)    Roberts testified that she was 36 years old and had graduated from high school. She is divorced and has two children, ages 17 and 18, who were being taken care of by Roberts' parents. (Id. at 46-47).

Roberts testified that she was in a car accident in 1991 that resulted in a broken back. (Id. at 95). Rods were placed in her back and then removed one year later, and she wore a back brace for one year. (Id.). She has had back pain since then, as well as migraines. (Id. at 91, 96). The migraines have gotten worse since a second car accident in 2004. (Id. at 91). She cannot remember much about that accident. (Id. at 96). Roberts stated that she had a workers' compensation claim in 2002 because of an injury to her right shoulder. (Id. at 90). At the time of the hearing, she said it was hard for her to reach, pull, push, and bathe with her right

arm. (Id.). She said when she writes, her arm cramps and the cramping travels to her back and neck. She said she cannot hold any weight with her right arm. (Id. at 91). She said she had recently been told that she has a slipped disc in her back but it does not yet require surgery. (Id. at 99).

Roberts stated that she went through drug and alcohol treatment in 1996 and was clean and sober for about 10 years. (Id. at 49). She said that she has had a job and supported herself all her life. (Id.). The ALJ noted, however, that Roberts' earnings records showed she had never earned more than $2,000 per year. (Id.). Roberts has worked as a certified nurse's aide, in a gas station, and cleaning banks. (Id. at 50-51). In 2003, she worked at Tri-Con for five or six months running a molding machine. (Id. at 51-52). Roberts said she quit because she could not grip and do the repetitive work. (Id. at 52). In 2004, Roberts quit her job cleaning a bank because her back bothered her. (Id. at 53). In 2006, she was fired for theft from her job as a cashier at Kwik Shop. (Id.). Roberts said she began using methamphetamine in 2006 and was charged twice with possession of a controlled substance and possession with intent to deliver. (Id.). Roberts served a total of 300 days in jail and was on supervised probation at the time of the hearing. (Id. at 54).

Roberts detailed her experience in treatment programs. She said she graduated from Touchstone after being in treatment for 45 days. She then went to Lutheran Family Services for intense outpatient treatment. She relapsed and went to St. Monica's for treatment. (Id. at 56). She had also relapsed in September 2009. (Id.). At the time of the hearing, Roberts said she was seeing a counselor at Centerpointe once a week. (Id. at 57).

Roberts said she started on medications for bipolar disease when she got out of jail in 2008. (Id. at 58). She said she was applying for disability because she has problems with her back and hips and she has asthma. She was not seeking

disability based on a drug addiction. (Id. at 60). Roberts said she cannot work because she is on about 20 medications, including psychiatric medicine, which makes it hard for her to focus and concentrate. (Id. at 61). After she got out of jail the most recent time, Roberts said she did on-the-job training with vocational rehabilitation through the Good Neighbor Center. She said by the end of the day, her hip would swell. (Id. at 62).

Roberts said she was not currently looking for a job because she has trouble standing to wait for the bus because of her back and because the medications make her tired. She has trouble concentrating and focusing and her hip swells to the point that she cannot wear her jeans. (Id. at 62). She said her back hurts if she sits all day. (Id. at 63). Roberts said she takes medication to help her sleep and then is tired when she wakes in the morning and it takes her a while to get motivated. She takes another pill to help her wake up and for energy. (Id. at 66).

While she was in jail, she worked on academic skills, but she said she is not good at reading and has difficulty with math. (Id. at 69). Records from Southeast Community College indicated that she reads at the 9th grade level and has math skills equivalent to the 6.8-grade level. (Id. at 304).

Roberts reported that on April 6, 2010, she went to the emergency room because she had muscle spasms and she couldn't talk. The physicians asked if she was using drugs and alcohol, but she told them it was the Seroquel. (Id. at 70). She said they gave her medication for Parkinson's disease. (Id. at 71).

Thomas England, Ph.D., a licensed clinical psychologist, testified as a medical expert. (Id. at 72, 175). He stated that Roberts' records include diagnoses for affective, anxiety-related personality, and substance addiction disorders. (Id. at 73). She had been receiving treatment for anxiety and depression since 2004, but the first full mental health evaluation was not completed until 2005. (Id. at 74).

18

England noted that essentially all treating professionals had diagnosed Roberts with a form of substance abuse disorder, typically methamphetamine dependency. (Id. at 78). He noted that the DSM would require a 12-month period of no abuse or dependency for a diagnosis of full sustained remission, and he could not find a 12-month span of remission in Roberts' record. (Id.). He stated that Roberts had either partial remission or early remission with respect to methamphetamine. (Id. at 78-79). England said he did not believe Roberts' condition would meet or equal a listing of an impairment if she were not using methamphetamine or poly-substances. (Id. at 80.) He stated she had mild to moderate impairment in activities of daily living, social functioning, concentration, persistence and pace. (Id.). The records indicated that Roberts was capable of improving with cessation of drug use and involvement in treatment. (Id. at 81). England said Roberts had a fairly good prognosis to be capable of sustaining full-time competitive employment at the unskilled level if she was free of drug or alcohol use. (Id.).

England noted that Roberts' GAF score did not vary through the course of treatment. (Id.). England did not agree with the checklist from Vest, which indicated that Roberts suffered from paranoia. Since April 2008, the progress notes indicated that Roberts' paranoia was very minimal, which showed that it may have been true at some points in treatment but was not characteristic throughout treatment. (Id. at 82). England agreed with the evaluators who said that Roberts could do unskilled work with compliance and abstinence. (Id. at 84).

England said the prospect for stabilizing Roberts' condition was far better when she was abstinent. Methamphetamine is "a particularly nasty drug in the sense of the, the sort of impact it tends to have on neurotransmitter processes in the brain." (Id. at 86). He said methamphetamine can take months to maximize

stabilization after cessation of use. (Id.). He said Roberts' psychiatric condition deteriorated rapidly when she began using methamphetamine again. (Id. at 87).

Michael McKeeman, Ph.D., vocational expert, (Id. at 101, 152), testified that Roberts would not be able to work at her previous jobs as machine molder, cashier, or nursing assistant. (Id. at 102). She would be able to do unskilled, light work, such as a fast food worker. (Id. at 103). In the area of unskilled sedentary work, Roberts would be able to do some production jobs and interviewing. (Id. at 104). She would have trouble in jobs where she has to use her mind to conceptualize information and is better suited to work in a performance setting, such as assembly. (Id. at 111). Although bookkeeping is an unskilled sedentary job, McKeeman said Roberts would be precluded from it based on her ninth-grade reading level and 6.8-grade math level. (Id. at 120-121). Those levels could also affect her ability to work as a general office clerk. (Id. at 121). She would also be able to do some packing jobs and cleaning jobs. (Id. at 122-123).

McKeeman prepared a summary of Roberts' past relevant work. (Id. at 285). It showed that Roberts had worked as a small products assembler, cashier, and fast food worker, which are all considered light unskilled work. (Id. at 285-88). She worked as a nurse assistant, which is considered semi-skilled medium work. (Id. at 287.)

### E. Other Evidence

The record shows that Roberts was sentenced to 180 days in jail on August 24, 2007. (Id. at 321). Roberts was placed on probation on December 26, 2007, for two years for possession of a controlled substance with intent to deliver, a Class IV felony. (Id. at 334). During probation, Roberts completed short-term residential treatment through Touchstone on May 15, 2008. She relapsed and entered residential treatment at St. Monica's and completed treatment on December 9,

20

2008. Between her release and April 2009, Roberts had not tested positive for any controlled substances or alcohol. (Id.). Roberts' probation was revoked on May 18, 2010.

The ALJ noted that records showed Roberts had taken 976 drug tests and tested positive on seven occasions for methamphetamine. The ALJ asked Roberts if the number could be a typographical error, and Roberts agreed, stating that she had been tested for the previous two years, from one to three times per week. (Id. at 40). At the time of the hearing, she was being tested two or three times per week. (Id.). Roberts said the last time she had tested positive was in September 2009. (Id. at 41). A letter explained that the reason for the large number of tests was because an offender submits to six different tests each time. (Id. at 336, 323). Roberts tested positive for methamphetamine on September 9, September 24, September 25, September 26, 2008, and November 3, November 4, and November 6, 2009. (Id.).

### F. The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See id. In this case, the ALJ found that Roberts is not disabled under the Social Security Act. (See Tr. at 11-26).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See id. The ALJ found that Roberts has not engaged in

substantial gainful activity since September 10, 2004, the alleged onset date. (Tr. at 14).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Roberts has the following severe impairments: mild scoliosis, asthma, arthritis and mild right hip degenerative joint disease. Her mental impairments include bipolar disorder, depression, and polysubstance abuse. (Tr. at 14). Those impairments cause significant limitations in Roberts' ability to perform basic work activities. (Id.).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d); see also 20 C.F.R. Part 404, Subpart P, App'x 1. If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant

does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a). The ALJ found that Roberts' impairments, including the substance use disorder, meet sections 12.04 and 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d) and 416.920(d)). (Tr. at 14). The ALJ stated that Roberts satisfied the "paragraph A" criteria because she had been diagnosed with major depressive disorder and anxiety disorder. To satisfy the "paragraph B" criteria, the impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. (Id.).

The ALJ noted that Roberts had been diagnosed with several mental impairments throughout the medical record. (Id.). The ALJ found that the testimony of Thomas England, Ph.D., a clinical psychologist and medical expert who testified at the hearing, accurately summarized the medical record. (Id.). England stated that Roberts' depressive disorder was stable on a combination of psychological medications. England could not find sufficient evidence to confirm a diagnosis of posttraumatic stress disorder based on Roberts' symptom descriptions. England stated the medical record supported a diagnosis for bipolar disorder. (Id.). England concluded that anxiety not otherwise specified was a likely diagnosis, but he would rule it out since it was not diagnosed by an acceptable medical source. He stated Roberts would not have anxiety over and above that which would accompany her depressive condition and/or situational factors. (Id. at 15). England

23

also testified that Roberts' record shows antisocial traits that could be considered a personality disorder. (Id.). England said that if Roberts was abusing drugs and alcohol, she would have marked limitations in activities of daily living, depending on her levels and patterns of substance abuse. (Id.).

The ALJ concurred with England's findings and gave his opinion significant weight. The ALJ concluded Roberts would be disabled due to her substance abuse. However, the substance abuse was material to a determination of disability. In the absence of drugs and alcohol, the ALJ found Roberts would not be disabled. (Id.). The "paragraph B" criteria were satisfied because Roberts' mental impairments, including the substance use disorder, cause at least two marked limitations or one marked limitation and repeated episodes of decompensation. The ALJ stated that England's conclusions were consistent with the record as a whole. (Id.).

The ALJ determined that, if Roberts stopped the substance use, she would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d) and § 416.920(d)). (Tr. at 16). Roberts would have moderate restriction in activities of daily living if the substance use was stopped. The ALJ concurred with the state agency opinion of Schmechel because it was consistent with the medical record as a whole. The ALJ found that in the absence of drugs and alcohol, Roberts would have no restrictions in daily living activities; mild difficulties with social functioning; moderate difficulties in concentration, persistence or pace; and Roberts would have experienced one to two episodes of decompensation. (Id.). Because the remaining limitations would not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, the paragraph B criteria would not be satisfied if Roberts stopped the substance use. (Id.). The ALJ also found that the paragraph C criteria would not

be met if Roberts stopped the substance use. The medical record did not document a history of a chronic affective disorder of at least two years' duration. (See Listing 12.04). With regard to Listing 12.06, the record did not reflect a complete inability to function independently outside the area of one's home. (See Listing 12.06. Tr. at 16-17).

Step four requires the ALJ to consider the claimant's RFC to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f).  The ALJ in this case found that if Roberts stopped the substance use, she would have the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), except she could occasionally climb, balance, stoop, kneel, crouch and crawl; and she must avoid concentrated exposure to heat, humidity, fumes and hazards. Assuming she is sober, Roberts would also be capable of performing unskilled work at the APV 1 and 2 level, which is routine, repetitive work that does not require extended concentration or attention. (Tr. at 17).

The ALJ stated that she must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Roberts' pain or other symptoms. (Id.). Second, once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. (Id.). For that purpose, the

ALJ must make a finding of credibility of the statements based on a consideration of the entire record. (Id.).

The ALJ found that Roberts' medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that her statements concerning the intensity, duration and limiting effects of the symptoms were not entirely credible to the extent they were inconsistent with the RFC assessment. (Id.).

The ALJ determined that Roberts' allegations of total disability due to mental impairments were not fully credible. (Id. at 18). In her initial disability report, she only alleged disability due to physical impairments, not mental. The record revealed several diagnoses for mental impairments, but as England stated, some of the diagnoses were not supported by sufficient medical evidence. In addition, her allegations of mental limitations were not fully credible because her symptoms were significantly exacerbated by her substance abuse. (Id.).

The ALJ stated that Roberts had not received treatment for her mental impairments as would be expected from a totally disabled individual. (Id. at 19). There was also evidence that Roberts had not been entirely compliant in taking prescribed medications, which suggested that the symptoms may not have been as limiting as she alleged. (Id.). The record showed that Roberts admitted her condition was better on medications, but she did not always take them. When Roberts relapsed on methamphetamines, she stopped taking her medication because she said she was feeling fine. The ALJ found that, even if Roberts were completely compliant with medications, unless she can remain sober, her treatment would not be effective. Overall, the claimant's course of medical treatment and use of medication was not consistent with her allegations of disabling mental impairments. (Id.).

The ALJ found that Roberts' allegations as to her drug use were not fully credible and that she had not been completely forthcoming with information about her drug use. (Id.). Her repeated relapses and failed drug treatment attempts also reduced the credibility of her allegations of sobriety. The ALJ found the record showed a more severe substance abuse problem than alleged by Roberts. (Id.). Roberts had never maintained a significant period of sobriety in which the severity of her mental impairments could be evaluated without drugs and alcohol. As a result, the ALJ could not find the claimant's mental impairments totally disabling. (Id. at 20).

The ALJ noted that Roberts had alleged disability due to several physical impairments, including back pain, mild scoliosis, arthritis, and asthma. (Id.). Although Roberts testified and reported that she was in constant severe, extreme pain, the ALJ determined that the objective medical evidence did not demonstrate abnormalities which would interfere with her ability to perform the range of work identified earlier. (Id.).

The ALJ stated that the objective medical evidence did not support Roberts' alleged limitations. (Id.). The ALJ stated that Roberts' condition had "been clouded with an overlay of drug use and drug seeking behaviors." (Id. at 21). The ALJ stated that the objective findings could not account for the limitations and pain testified to at the hearing and that these medical findings would not be expected to be associated with a totally disabled individual. (Id.).

The ALJ found no medical evidence to support Roberts' claims of extreme limitations in her arms such that she has difficulty writing and reaching, pushing and pulling. (Id.). Roberts worked in a production setting in 2006, which required at least the same amount of hand use typical of jobs within the RFC. The production work was after Roberts had been given a five percent disability

determination by Kumar. Based on her ability to work after that determination, Roberts' condition appeared to have improved. (Id.). In light of the improvement, the ALJ granted little weight to Kumar's opinion, and the ALJ found Roberts had no limitation with her right hand. (Id. at 22).

The ALJ found that Roberts' asthma, standing alone or in combination with her other impairments, did not render her disabled. (Id.). The record showed that Roberts continued to smoke cigarettes and that her treatment for asthma had been intermittent. The condition was well-controlled with medication. (Id.).

Roberts' testimony that the side effects of the medications make her drowsy, make it hard to focus, and cause her confusion was not fully credible because she had not mentioned those symptoms to her treating physicians or attempted to change her medications. (Id.).

The ALJ found that Roberts' allegations of total disability were not fully credible and that her presentation at the hearing was dramatic, meaning that her subjective symptoms were out of proportion to the objective findings. (Id.).

The ALJ found Roberts could only tolerate occasional or superficial contact with coworkers, supervisors and/or the public and she would be limited to routine repetitive tasks which did not require extended periods of concentration or attention. The ALJ concluded that Roberts' subjective complaints did not warrant any additional limitations beyond those established in the RFC. (Id.).

The ALJ found two factors weighed against considering fairly limited daily activities as strong evidence in favor of finding Roberts' disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if her daily activities are as limited as alleged, it is difficult to attribute that degree of limitation to her medical condition, as opposed to other

reasons, in view of the relatively weak medical evidence. Overall, Roberts'
reported limited daily activities were outweighed by other factors. (Id. at 23).

The ALJ noted that she must also consider Roberts' work history in
assessing her credibility. (Id.). The ALJ found that Roberts had attempted to
exaggerate her work history. Her testimony that she had constantly worked all her
life and worked multiple jobs was unsupported by her earnings record, which
showed she never earned more than $4,000 in a year. (Id.). Roberts' work history
did not bolster her allegations of total disability. (Id.).

The opinion of Tina Vest, APRN, was given no weight by the ALJ. (Id. at
24). Vest was not qualified to give a medical opinion regarding Roberts' mental
impairments because she was not an acceptable medical source. The ALJ said
Vest's opinion minimized Roberts' very serious problem with drugs and constant
relapses. The ALJ found Vest's opinion inconsistent with the medical record and
granted it no weight. (Id.).

Based on the substantial weight of the objective medical evidence, the
course of treatment, Roberts' level of daily activity, and her work history, the ALJ
found that Roberts retained the RFC for light work with additional limitations as
noted earlier.

At step five, the ALJ found that if Roberts stopped the substance use,
considering her age, education, work experience, and RFC, there would be a
significant number of jobs in the national economy that she could perform. (Id. at
25). The ALJ found that, based on the vocational expert's testimony, if Roberts
stopped the substance use, she would be capable of making a successful adjustment
to work that exists in significant numbers in the national economy. A finding of
"not disabled" was therefore appropriate. (Id. at 26). Roberts' substance use
disorder was found to be a contributing factor material to the determination of

disability, and Roberts was not disabled within the meaning of the Act at any time from the alleged onset date through the date of the decision. (Id.).

### III.  STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the

law." Id. (citations omitted).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

### A. Evaluation of Drug and Alcohol Abuse Materiality

Roberts first argues that the ALJ failed to evaluate properly the issue of drug and alcohol abuse (DAA) materiality in light of SSR 13-2P. I first note that SSR 13-2P went into effect on March 22, 2013, which was after the decision of the ALJ in this case. SSR 13-2P sets forth the questions to be answered by the adjudicator in evaluating DAA cases. The ruling provides that the key factor to be examined in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether a claimant would still be found disabled if he or she stopped using drugs or alcohol. SSR 13-2P(2). The ruling states that DAA is not material to the determination that the claimant is under a disability if the claimant would still meet the definition of disability if he or she were not using drugs or alcohol. SSR 13-2P(2)(a). If DAA is not material, the claimant will be found to be disabled. Id. However, DAA is material to the determination of disability if the claimant would not meet the definition of disability if he or she were not using drugs or alcohol. If DAA is material, the claimant is found not disabled. SSR 13-2P(2)(b).

In her brief, Roberts states that the ALJ correctly first determined Roberts to be disabled from both DAA and a co-occurring mental disorder. (Pl.'s Brf at 6). She alleges, however, that the ALJ failed to find evidence that the co-occurring mental disorder would improve and not be disabling in the absence of DAA.

The ALJ gave England's opinion significant weight and concurred with his findings, concluding that Roberts would be disabled due to her substance abuse. However, the ALJ found that the substance abuse was material to a determination of disability. In the absence of drugs and alcohol, the ALJ found Roberts would not be disabled. (Tr. at 15). England testified that Roberts would not meet any mental listings if she were sober. He said that if Roberts was abusing drugs and alcohol, she would have marked limitations in activities of daily living, depending on her levels and patterns of substance abuse. (Id.).

The ALJ found that if Roberts stopped the substance use, the remaining limitations would cause more than a minimal impact on her ability to perform basic work activities. Therefore, she would continue to experience significant limitations regarding her ability to perform basic work activities because of her impairments. (Id. at 15-16). The ALJ determined that, if Roberts stopped substance use, she would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d) and § 416.920(d)). (Tr. at 16). Roberts would have moderate restriction in activities of daily living if the substance use was stopped. (Id.). The record supports the ALJ's decision.

The opinion of Schmechel supported a finding of "not disabled" in the absence of substance abuse. Schmechel found that Roberts' drug and alcohol use appeared to play a major role in her mental health status. Schmechel found that Roberts appeared capable of simple, unskilled employment at the substantial gainful activity level. (Id.). The ALJ and England concurred with Schmechel's opinion because it was consistent with the medical record as a whole. (Id.).

The ALJ correctly followed the two-step process of first determining whether there is an underlying medically determinable physical or mental

impairment that could reasonably be expected to produce Roberts' pain or other symptoms. (Id. at 17). The ALJ determined that Roberts' impairments could reasonably be expected to produce the alleged symptoms. Then, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms and made a finding of credibility of Roberts' statements. (Id.). The ALJ determined that Roberts statements concerning the intensity, duration and limiting effects of the symptoms were not entirely credible to the extent they were inconsistent with the RFC assessment.

As noted by the ALJ, Roberts did not allege any mental impairment in her initial disability report. Although the record revealed several diagnoses for mental impairments, not all of the diagnoses were supported by sufficient medical evidence. In addition, Roberts' allegations of mental limitations were not fully credible because her symptoms were significantly exacerbated by her substance abuse.

I agree with the ALJ's finding that Roberts had not received treatment for her mental impairments as would be expected from a totally disabled individual. (Id. at 19). Although Roberts had taken part in a number of different drug treatment programs, she did not complete most of them. She was not always compliant in taking prescribed medications, even though she admitted her condition was better when she took the medications. The ALJ was correct in determining that Roberts' course of medical treatment and use of medication was not consistent with her allegations of disabling mental impairments. (Id.).

The ALJ followed the correct procedure to determine that the evidence supported a finding that Roberts' co-occurring mental disorders were not disabling in the absence of her DAA. The ALJ gave weight to England, who testified that Roberts' condition would not meet any listed impairment if she were sober. He

also stated that Roberts' condition improved during two periods of time when she had sustained periods of non-use. (Id. at 79-81). England stated that Roberts' mental impairments were under control prior to 2006, when she again began using methamphetamine. (Id. at 76). The progress notes from Tran showed that Roberts' condition became more stable between 2004 and 2006; again, prior to her use of methamphetamine. (Id. at 79, 438-76). I find no error in the ALJs' evaluation of the materiality of Roberts' DAA.

Roberts also argues that the ALJ was incorrect in giving little weight to the opinion of Vest, a nurse practitioner. The ALJ determined that Vest was not an "acceptable medical source" and that her opinion was inconsistent with the medical record. (Id. at 24). Nurse practitioners are not included in the list of acceptable medical sources found in 20 C.F.R. § 404.1513 and § 416.913. They are listed as other medical sources who may provide evidence to show the severity of an impairment and how it affects the claimant's ability to work. Id. It is proper for the ALJ to make credibility determinations. Reed v. Sullivan, 988 F.2d 812 (8th Cir. 1993). The ALJ should state the reasons on the record for the credibility determinations. Id. In this case, the ALJ specified her reasons for attaching little weight to Vest's opinion. In addition, England testified that Vest's opinion was not supported by other evidence in the record. (Tr. at 24, 81-83). England noted that, although Vest stated that Roberts suffered from paranoia, there was little evidence in the progress notes about any paranoid reactions. (Id. at 972, 994-1013). And none of the other psychological sources, including Schmechel and Newman, agreed with Vest. (Id. at 81, 813, 902). I find no error in the weight given to Vest's opinion by the ALJ.

Roberts also asserts that another issue in this case is the length of time an individual needs to be abstinent before an accurate evaluation can be determined to

decide whether DAA is material to disability. (Pl's Brf. at 7). She argues that the ALJ erred in finding that Roberts had not been abstinent long enough to show that DAA was not material. England testified that the DSM requires a 12-month period of no substance abuse for a patient to be considered in full sustained remission. (Tr. at 15). He was not able to find a documented 12-month period of sobriety for Roberts since the alleged onset date. (Id.).

However, to support this argument, Roberts again relies on an opinion written by Vest which stated that Roberts was nine months into a 13-month period during which the results of frequent drug testing were all negative. (Id. at 334-36). As noted earlier, Vest was not an acceptable medical source, and the ALJ was not required to attach credibility to her reports. The record does not support a finding that Roberts was clean for any 12-month period after the alleged onset of her disability. The ALJ properly considered the evidence of periods of remission.

### B. Opinion of Rajesh Kumar, M.D.

Roberts argues that the ALJ erred in discounting the opinion of Rajesh Kumar, M.D. Kumar had given Roberts a five-percent disability to her right arm after a work-related injury in 2002. He restricted her to light duty work and to lifting, pulling, or pushing 15 pounds. (Id. at 1054). The ALJ gave Kumar's opinion little weight and found that Roberts had no limitation in using her right hand. (Id. at 21-22). The ALJ noted that Kumar's opinion was given in 2004 and that Roberts worked in a production setting in 2006. Based on her ability to work after Kumar's determination, Roberts' condition appeared to have improved. (Id. at 21). In light of the improvement, the ALJ found Roberts had no limitation with her right hand. (Id. at 22).

Roberts argues that the ALJ was incorrect because there was no medical or vocational evidence to support a finding that Roberts' ability had improved and

because the work after the alleged onset date was previously found by the ALJ not to have been significant gainful activity.

In the physical RFC assessment completed by Reed in September 2008, (Id. at 837-844) Roberts' alleged difficulties with her arms were not mentioned. The primary diagnosis was mild scoliosis and chronic back and hip pain and the secondary diagnosis was asthma and a history of migraines. Other alleged impairments were being overweight and history of methamphetamine abuse. (Id. at 837). Reed determined that Roberts could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She had no manipulative limitations. (Id. at 840-41). Knosp affirmed Reed's RFC. (Id. at 904). Again, there was no mention of arm problems. She had recently undergone physical therapy for her foot. (Id.).

The record does not support a finding that the ALJ should have given more weight to Kumar's medical opinion. The records from Kumar are dated January 7, 2004. He found that Roberts had a full range of motion in her right shoulder. Kumar stated that Roberts had sustained a trapezius muscle strain and had developed a chronic pain syndrome. She had reached maximum medical improvement, but would not require future treatment or surgery. (Id. at 1054). Even if the ALJ had given greater weight to Kumar's opinion, it would not have changed the finding of no disability.

## C. Hypothetical Question

Finally, Roberts asserts that the hypothetical questions posed to the vocational expert were flawed. She argues that the questions were deficient because the hypotheticals did not include any specific limitations regarding Roberts' abilities with her hands or arms. In addition, Roberts objects because the hypotheticals did not include limitations in the RFC that were contained in the

36

records from Vest and Kumar.

The ALJ asked several hypothetical questions of McKeeman, the vocational expert. She asked him to review the report from Vest, but Kumar's opinion was not included in the hypothetical. Although Roberts objects that the hypotheticals did not include any limitations on the use of her hands or arms, the hypothetical included the ability to frequently lift or carry 10 pounds. (Id. at 102).

"The hypothetical question need only include those impairments and limitations found credible by the ALJ." Gragg v. Astrue, 615 F.3d 932 (8th Cir. 2010). In this case, the ALJ included the physical and mental impairments found to be credible. "'While the hypothetical question must set forth all the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments.'" Id., 615 F.3d at 942, quoting Roe v. Chater, 92 F.3d 672, 676 (8th Cir. 1996). I find no error in the hypothetical questions posed by the ALJ.

## V.   CONCLUSION

The ALJ determined that if Roberts stopped substance abuse, there would be a significant number of jobs in the national economy that she could perform, taking into consideration her age, education, work experience, and RFC. (Tr. at 25). If she stopped substance use, she would be capable of making a successful adjustment to work. While the substance use disorder was a contributing factor material to the determination of disability, Roberts was not disabled within the meaning of the Act. (Id. at 26). I find that there is substantial evidence based on the entire record to support the ALJ's factual findings.  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). I find that the decision must be affirmed.

IT IS ORDERED that the Commissioner of Social Security's decision is affirmed.

Dated March 5, 2014.

BY THE COURT

Warren K. Urbom
United States Senior District Judge